

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 30, 2021**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| REAGOR-DYKES MOTORS, LP,[1] | § | Case No.:  18-50214-RLJ-11 |
| | § | (Jointly Administered) |
| Debtors. | § | |
| _____ | § | _____ |
| | § | |
| DENNIS FAULKNER, Trustee of | § | |
| Reagor-Dykes Auto Group Creditors | § | |
| Liquidating Trust, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Adversary No. 20-05039 |
| v. | § | |
| | § | |
| AIMBANK, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

---

[1]  The following chapter 11 cases are jointly administered in Case No. 18-50214: Reagor-Dykes Motors, LP, Reagor-Dykes Imports, LP (Case No. 18-50215), Reagor-Dykes Amarillo, LP (Case No. 18-50216), Reagor-Dykes Auto Company, LP (Case No. 18-50217), Reagor-Dykes Plainview, LP (Case No. 18-50218), Reagor-Dykes Floydada, LP (Case No. 18-50219), Reagor-Dykes Snyder, L.P. (18-50321), Reagor-Dykes III LLC (18-50322), Reagor-Dykes II LLC (18-50323), Reagor Auto Mall, Ltd. (18-50324), and Reagor Auto Mall I LLC (18-50325).

The defendant, AimBank, filed its motion under Bankruptcy Rule 7012(b) and Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure seeking dismissal of all counts of Plaintiff's Second Amended Complaint (the Complaint).[2]  The plaintiff, Dennis Faulkner, Trustee of the Reagor-Dykes Auto Group Creditors Trust, filed his response opposing dismissal; alternatively, he requests an opportunity to amend the Complaint.

## I.

A dismissal motion brought under Rule 12(b)(1) is a challenge to the court's jurisdiction. *See* Fed. R. Civ. P. 12(b)(1).  "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998).  In ruling on the motion, all factual allegations in the plaintiff's complaint must be accepted as true. *See Den Norske Stats Oljeselskap As v. HeereMac Vof*, 241 F.3d 420, 424 (5th Cir. 2001).  A dismissal for lack of subject-matter jurisdiction is only appropriate when "it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle the plaintiff to relief." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  The burden of proof regarding the existence of jurisdiction always rests with the plaintiff. *Id.*

Rule 12(b)(6) allows dismissal of a case if a plaintiff fails "to state a claim upon which relief can be granted."  This rule applies in adversary proceedings as incorporated by Bankruptcy Rule 7012(b).  Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to

---

[2] "Bankruptcy Rule" refers to a rule of the Federal Rules of Bankruptcy Procedure.  All other "Rule" references refer to the Federal Rules of Civil Procedure.

state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A claim satisfies the plausibility test "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. [*Twombly*'s] plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal citations omitted). While a complaint need not contain detailed factual allegations, it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007); *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004). "Because a complaint must be liberally construed in favor of the plaintiff, a motion to dismiss under Rule 12(b)(6) is generally viewed with disfavor and is rarely granted." *Ins. Distrib. Consulting, LLC v. Freedom Equity Grp., LLC*, No. 20-cv-00096, 2020 WL 5803249, at *2 (S.D. Tex. Sept. 4, 2020) (citing *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)). In ruling on such a motion, the court looks only at the complaint. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). The court may also consider documents incorporated into the complaint by reference and matters of which a court may take judicial notice. *See Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019); *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

II.

The Complaint

A.

The Court reviews the Complaint and addresses the factual allegations as true.  For this, the Court refers to the plaintiff, Dennis Faulkner, Trustee of the Reagor-Dykes Auto Group Creditors Liquidating Trust, as **Trustee**; the debtors will be collectively referred to as **Debtors** or the **Reagor-Dykes entities**.

By the Complaint, the Trustee contends that the Reagor-Dykes entities' rogue CFO, Shane Smith, collaborated with AimBank to defraud the Debtors and their creditors.  The fraud results from a massive kiting scheme in which deposits were made in and among certain Debtor-entities' bank accounts in amounts that, at the time the deposits were made, far exceeded the Debtors' ability to generate or honor.  From August 1, 2017 through August 1, 2018, $449,069,845.15 passed through the two bank accounts of Reagor-Dykes Snyder, L.P. (RD Snyder) and Reagor-Dykes Motors, LP (RD Lamesa).  The vast majority of these funds represented deposits in and outgoing checks to and from other Reagor-Dykes entities.  In January 2018, more than $29 million dollars were deposited and debited from the RD Snyder and RD Lamesa bank accounts, with approximately 95% of all outgoing checks made to other Reagor-Dykes entities.  In February, March, and April of 2018, over $109 million dollars went in and out of the RD Snyder account at AimBank.  RD Snyder's annual sales for all of 2017 were $47,715,224.00.  This practice generated millions of dollars of float for the Debtors.  Additionally, while the numbers suggest the fraudulent nature of the practice, AimBank's own records show that RD Snyder sold the same car for the same price multiple times to different

Reagor-Dykes entities—an example of how funds were generated but with no ability to honor the credit given.

The other way in which Smith, with AimBank's acquiescence, created "float" was through the perverted use of sight drafts. The Complaint describes how the use of sight drafts *should* work in a "normal" deal where one dealer is buying a vehicle from another *unrelated* dealer. It involves three main steps. First, the selling dealership deposits a draft and the original certificate of title for the vehicle with its own bank. Second, the selling dealership's bank presents the draft and original certificate of title to the purchasing dealership's bank for payment. The draft contains certain instructions, such as payment amount and time of payment, which is usually seven days after presentment. The buying dealership's bank inspects the certificate of title to ensure authenticity. Third, if the title is good and the buying dealership has sufficient funds in its account to pay for the vehicle, the buying dealership's bank issues and delivers a cashier's check for payment on the draft to the selling dealership's bank. At that time, the buying dealership's bank debits the payment from the buyer's bank account and the selling dealership's bank deposits the money into the seller's bank account upon receipt of the cashier's check. According to the Trustee, the use of sight drafts is an antiquated process that was more appropriate "to buy and sell herds of cattle between far-flung ranches in the 19th century" instead of between car dealerships—particularly related dealerships. ECF No. 39 ¶ 39.[3]

The Debtors, however, corrupted the use of sight drafts. Instead of delivering the original certificates of title, RD Snyder, for example, would submit photocopies of such documents with the draft. Upon submission, AimBank would give immediate credit to RD Snyder's account.[4] AimBank would then present the draft and photocopies to the purchasing dealership's bank—a

---

[3] "ECF No." refers to a docket entry in this adversary proceeding, unless otherwise stated.
[4] The Trustee alleges that this immediate credit was a loan for the value of the future sale.

related Reagor-Dykes dealership. At the end of the draft period, the purchasing dealership's bank would issue a cashier's check to AimBank, drawn on the funds of the related Reagor-Dykes entity, and AimBank would retain the funds of the cashier's check as repayment for the immediate credit.

The Trustee alleges that in early January 2017, AimBank acquiesced to this modified sight-draft process by agreeing to give RD Lamesa immediate credit on deposited sight drafts. This "agreement" was evidenced by an email sent by Mike Tibbit, who handled "the relationship" between the Debtors and AimBank and was Senior Vice President of AimBank. On March 4, 2017, Mr. Tibbit authorized this same process for RD Snyder. (At some point, AimBank ceased requiring that the dealerships tender original certificates of title, allowing photocopies to be summitted instead, though it is not clearly alleged in the Complaint when this happened.)

The Trustee says that AimBank knew that Smith was engaged in a massive kiting scheme. The sheer magnitude of the scheme would have been apparent to the bank. The accounts were held at AimBank; the bank, as a lender to Reagor-Dykes, regularly received financial information from Reagor-Dykes; the bank's own analytic software program would have detected the scheme; the day-to-day knowledge of certain bank personnel of what Smith was doing would have revealed that there was a problem; and, also, the bank's actual accommodation and participation in the corrupted use of sight drafts reflect that the bank knew what Smith was doing.

AimBank benefited from its participation in Smith's fraudulent schemes. In December of 2017, AimBank's holding company AIM Bancshares, Inc. announced a merger with Platinum Bancshares of Texas, Inc. and its wholly owned subsidiary Platinum Bank. The merger was

completed on April 27, 2018, when AimBank's parent company acquired all the issued and outstanding stock of Platinum Bancshares of Texas, Inc. and its wholly owned subsidiary Platinum Bank. The merger was structured as a share-for-share purchase instead of a cash purchase. The Trustee alleges that by allowing the check-kiting and sight draft schemes to happen, AimBank was able to market itself as a strong and growing institution to Platinum Bank's shareholders that made AimBank appear more valuable under a stock deal rather than a cash deal. ECF No. 39 ¶¶ 57–58. On May 24, 2018, after the merger was complete, AimBank notified Smith that it would no longer extend immediate credit on intercompany sight drafts.

Trustee separates the factual allegations regarding the breach of contract, based on the Deposit Account Control Agreement (the "Deposit Control Agreement"), from the balance of the allegations. Under a Bankruptcy Rule 9019 settlement approved by the Court in May of 2020, AmeriCredit Financial Services, Inc. d/b/a GM Financial (GM Financial) assigned its claims against AimBank to the Debtors. The Trustee alleges that these claims subsequently vested in the Reagor-Dykes Auto Group Creditors Liquidating Trust (Liquidating Trust). The Deposit Control Agreement was entered into among RD Snyder, GM Financial, and AimBank in early 2018. GM Financial was RD Snyder's floor-plan lender, and the Deposit Control Agreement was meant to protect GM Financial's security interest in RD Snyder's property, including vehicles and sales proceeds. The Trustee quotes several provisions of the Deposit Control Agreement, with a copy attached to the Complaint as Exhibit B. Trustee alleges that AimBank breached its representation that there were no encumbrances on the RD Snyder account because AimBank knew the account was being used to kite funds and thus there were outstanding claims or encumbrances against the account and in favor of other financial institutions that had honored RD Snyder's checks. The Trustee further alleges that AimBank had agreed to hold the funds in

the RD Snyder account "in trust" for GM Financial and that the sight-draft scheme was used by both RD Snyder and AimBank to circumvent GM Financial's security interest in the account. The Trustee asserts that AimBank breached its duty of cooperation by actively assisting and facilitating RD Snyder's failure to remit trust proceeds to GM Financial. The breach caused damages in the amount of $3,131,482.69.

Finally, the Trustee also discusses the two certificates of deposit (CDs), one that Reagor-Dykes Plainview, LP (RD Plainview) and one that Reagor-Dykes Auto Company, LP (RD Auto) held at AimBank. The RD Plainview CD is in the amount of $514,477.58; the RD Auto CD is in the amount of $541,776.91. The bank, in the Reagor-Dykes entities' bankruptcy case, sought and obtained stay relief to set-off the CDs. The Trustee seeks return of the CDs.

B.

The Trustee asserts seven grounds for recovery:

- Count One for Avoidance, Preservation, and Return of Actual and Constructive Fraudulent Transfers under §§ 544, 548(a)(1)(A), 548(a)(1)(B) and Texas Business and Commerce Code §§ 24.005, 24.006 [5]

- Count Two for Recovery of Avoided Transfers under §§ 550 and 551

- Count Three for Equitable Subordination

- Count Four for Objection to and Disallowance of All Claims under § 502(d), (j)

- Count Five for Breach of Contract

- Count Six for Attorneys' Fees and Costs

- Count Seven for Return of Certificates of Deposits

The Trustee's fraudulent transfer claims concern RD Snyder. RD Snyder maintained a bank account at AimBank into which the bank would give immediate credit to RD Snyder for

---

[5] All § references refer to 11 U.S.C. unless otherwise stated.

presented sight drafts. The Trustee states that this practice constituted unsecured credit extensions by the bank. Payment on these sight drafts from other Debtor-entities was not credited to the RD Snyder account, but rather AimBank kept those funds to cover the immediate credit extended to RD Snyder. This process, the Trustee alleges, was done to hinder, delay, and defraud the Debtor-entities' creditors, and more specifically GM Financial. Beginning in April 2018, GM Financial was RD Snyder's floorplan lender. AimBank is a transferee in this scheme and thus liable under §§ 548(a)(1)(A) and 548(a)(1)(B) and under Texas law, Texas Business and Commerce Code §§ 24.005 and 24.006. The Trustee identifies each transfer he seeks to avoid in an attached exhibit by the date of each sight draft deposit, the draft amount, the receiving bank, the receiving dealership that paid-off RD Snyder's loan from AimBank, the date of the transfer, AimBank's item number, and cashier's check number where possible. ECF No. 39, Ex. A.

Under Count Two, the Trustee seeks, as one of his remedies for the avoided transfers of Count One, the value of such transfers. This recovery is based on § 550(a). Trustee also asks, per § 551, that the avoided transfers be preserved for the benefit of the Liquidating Trust.

For Count Three, the Trustee asserts that AimBank's acquiescence to and participation in Smith's scheme injured other creditors and thus AimBank's claims should be equitably subordinated to other creditors under §§ 510(c) and 105(a) of the Bankruptcy Code.

Count Four is the Trustee's objection to AimBank's claims. Three grounds support the claim objection. First, under § 502(d), until AimBank pays the Trustee the amount equal to any avoided transfers, plus interest and costs, its claims must be disallowed. Second, also under § 502(d), AimBank's claims must be denied to the extent AimBank's liability to the Debtors' bankruptcy estates exceeds its claims. AimBank would have no enforceable right to payment, no

debt, and thus no "claim" under § 101(5). And if it has no claim, any security interests are extinguished. Last, under § 502(j), all of AimBank's previously allowed claims must be reconsidered and disallowed until the Trustee's investigation against AimBank is concluded and AimBank pays to the Liquidating Trust an amount equal to the aggregate amount of the avoided transfers, plus interest and costs.

For the cause under Count Five, the Trustee brings the breach of contract claim that was assigned to the Debtors by GM Financial in a settlement agreement approved by this Court.[6] The Trustee submits that AimBank breached the Deposit Control Agreement that was entered into by RD Snyder, AimBank, and GM Financial. The breach of contract claim is based on two premises: AimBank breached its representation and warranty that there were no encumbrances against the account, and AimBank breached its duty of cooperation.

Under Count Six, the Trustee seeks recovery of attorneys' fees and costs for filing and prosecuting this action.

Last, the Trustee brings a turnover action under § 542 against AimBank for two CDs. RD Plainview and RD Auto each held a CD at AimBank. In March of 2019, this Court approved AimBank's motion to lift stay as to the CDs and allowed AimBank to offset the CDs against outstanding debts.[7] Trustee asserts that the CDs are property of the estate and need to be turned over to the Liquidating Trust.

III.

The Motion to Dismiss

AimBank's motion to dismiss is based on three general grounds: the Trustee's lack of standing under Rule 12(b)(1), failure to state a claim under Rule 12(b)(6), and failure to plead

---

[6] Case No. 18-50214, ECF Nos. 1804, 1833.
[7] Case No. 18-50214, ECF No. 1097.

fraud and equitable subordination with particularity under Bankruptcy Rule 7009. The motion

also asks for a judgment on the pleadings under Rule 12(c) and to strike a portion of the

Complaint under Rule 12(f) (as made applicable by Bankruptcy Rule 7012(b)).

A.

AimBank contends that the Trustee does not have standing to pursue any of the causes of

action in the Complaint for three reasons: there was not adequate disclosure of plan amendments

and retained causes of action, which denied AimBank due process; the plan documents did not

contain specific and unequivocal language to properly preserve any of these claims against

AimBank; and the Debtors' schedules and statement of financial affairs did not disclose any of

these causes of action. The question of standing is a jurisdictional requirement that is governed

by Rule 12(b)(1). *See Spicer v. Laguna Madre Oil & Gas II, L.L.C. (In re Tex. Wyo. Drilling,*

*Inc.)*, 647 F.3d 547, 550 (5th Cir. 2011).

<u>Adequate Disclosure of Plan Amendments and Retained Causes of Action</u>

AimBank was not denied due process. The confirmed plan was an amended version of

the plan that was voted on several months before confirmation. The voted-on plan and approval

of the disclosure statement both properly adhered to the Bankruptcy Code and Rule's notice

requirements. In September of 2019, the Court approved the disclosure statement that included

reservations of causes of action that were almost identical[8] to the causes of action contained in

---

[8] The differences between the retained causes of action in the approved disclosure statement and the confirmation order include: changing the heading from "Causes of Action" to "Retained Causes of Action"; eliminating any reference to the Reorganized Debtor(s); elimination of a repetitive sentence about reserving right to supplement claims and causes of action; adding "its officers and directors" after a few potential defendants; and nine new parties are listed explicitly by name. AimBank appears as the third explicitly named potential defendant in *each* document. For AimBank to state that "The list of alleged preserved claims was not disclosed until the day of confirmation when the Debtors uploaded their complete proposed confirmation order", ECF No. 41 at 6, and that there are "inconsistencies between the Approved Disclosure Statement and the Confirmed Plan" that "are acute when considering the Retained Causes of Action," ECF No. 41 at 2, is misleading, especially as to AimBank.

the confirmation order issued in July of 2020.[9] The voted-on plan, which has a long and complicated history of its own, was a "toggle" plan that proposed both a possible restructuring alternative and a possible liquidation alternative. The confirmed plan was the liquidation alternative, an alternative that was considered and disclosed in the voted-on plan.

The plan that was eventually confirmed was a modified version of the voted-on plan. A modified plan must provide a new disclosure statement and resolicit votes when the modifications materially and adversely affect the treatment of a creditor who voted in favor of the plan.[10] *See, e.g., In re Am. Solar King Corp.*, 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988) ("Further disclosure occurs only when and to the extent that the debtor intends to solicit votes from previously dissenting creditors or when the modification materially and adversely impacts parties who previously voted for the plan."). Additionally, whether a disclosure statement provides adequate disclosure for an amended plan is relevant only to creditors that voted in favor of the plan because "additional disclosure about the modification would not have affected" a rejecting creditor's vote, and therefore, "the creditor [is] not aggrieved by the allegedly inadequate disclosure." *In re Nat'l Truck Funding LLC*, 588 B.R. 175, 179 (Bankr. S.D. Miss. 2018). Here, the confirmed plan was an amended version of the voted-on plan that essentially eliminated the restructuring alternative; the modifications did not materially and adversely affect the treatment of any creditor's claims who voted in favor of the plan; new or additional disclosures and a resolicitation of votes were not necessary.

---

[9] The most relevant difference between the confirmed plan and voted-on plan was that the confirmed plan included the contents of the settlement agreement with GM Financial and stated that one of the provisions in the settlement was that GM Financial "assigned to the Debtors all of its claims, causes of action, and demands it holds against AIM Bank [sic]." Case No. 18-50214, ECF No. 1897 at 2. Both the voted-on plan and confirmed plan included that "All Causes of Action against AIM Bank [sic] are preserved under the Plan." Case No. 18-50214, ECF Nos. 1391 at 34; 1897 at 23.

[10] AimBank did not cast a vote in favor of the plan. ECF No. 1637, Ex. B.

Last, notice of pre-confirmation plan modifications, under Bankruptcy Rule 3019(a), is only required to be given "to the trustee, any committee appointed under the Code, and any other entity designated by the court." AimBank does not fall within these categories.[11] The court is required, though, to hold a hearing on the modification, and, generally, notice and hearing of a plan modification is sufficient when the modification is proposed during a hearing—and may even occur at the *confirmation* hearing. *See In re T-H New Orleans Ltd. P'ship*, 188 B.R. 799, 808–09 (E.D. La. 1995) (holding that when modifications are inconsequential, confirmation hearing is sufficient for notice purposes and no new hearing is required).

There was adequate disclosure of plan documents and plan document amendments, and AimBank was not denied due process by the amendments.

<u>Specific and Unequivocal Language in Plan Documents</u>

AimBank argues that the Trustee does not have standing to bring the causes of action in the Complaint because the causes of action were not properly reserved with "specific and unequivocal" language in the plan documents. Under the Code, once a chapter 11 plan is confirmed, a debtor-in-possession will lose its status and, with it, standing to pursue the estate's claims. Section 1123(b)(3), however, allows a debtor to retain the bankruptcy estate's causes of action by providing for the retention of such claims in its reorganization plan. *See* § 1123(b)(3). Under this provision, the debtor may reserve some or all of its claims to a trustee who then pursues the claims for the benefit of creditors. *See Torch Liquidating Tr. ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 387 (5th Cir. 2009).

In the Fifth Circuit, a cause of action is reserved only if the reservation is "specific and unequivocal." *Dynasty Oil & Gas, LLC v. Citizens Bank (In re United Operating, LLC)*, 540

---

[11] AimBank received notice of amended plan filings and court hearings regarding those filings.

F.3d 351, 355 (5th Cir. 2008). The "specific and unequivocal" language should appear in "plan documents." *Lauter v. Citgo Petrol. Corp.*, No. 17-2028, 2018 WL 801601, at *7 (S.D. Tex. Feb. 8, 2018). In deciding if a cause of action has been properly reserved, courts look to the disclosure statement and the plan. *See, e.g.*, *Wooley v. Haynes & Boone, L.L.P. (In re SI Restructuring Inc.)*, 714 F.3d 860, 864 (5th Cir. 2013) (citing *In re Tex. Wyo. Drilling, Inc.*, 647 F.3d at 551). What exactly meets the "specific and unequivocal" standard in the Fifth Circuit is not clearly defined—it is decided on a case-by-case basis. *Bensimon v. Burr (In re Crescent Res., LLC)*, 463 B.R. 423, 430 (Bankr. W.D. Tex. 2011).

AimBank argues that the plan documents do not contain specific and unequivocal language to properly preserve any causes of action against it because the reservation of claims is "a list of basically every claim recognized under American jurisprudence," a list of the Debtors, and a list of 47 potential defendants. ECF No. 41 at 4, 7. AimBank believes that to be "specific and unequivocal" the reservation of claims must match-up each of the potential causes of action with each potential defendant, and on behalf of which Debtor. The "nexus" of these three lists, though, is not required to be "specific and unequivocal" in the Fifth Circuit.

One court found that disclosure was adequate where the basis of recovery was included in a disclosure statement's reserved causes of action along with a list of potential defendants by name. *Lauter*, 2018 WL 801601, at *10–11. AimBank cites to this case but complains that there is no nexus between cause of action and defendant, as well as excluding the potential amount of recovery for each suit. Specifications of a potential claim, while surely helpful to potential defendants, is not required under Fifth Circuit law. Here, the reservation of claims contained in the plan documents is "specific and unequivocal" to preserve the causes of action in this

Complaint. While the list of claims and potential defendants is extensive, it nevertheless puts AimBank on notice that, post-confirmation, the Trustee may bring a claim against it.

The Trustee has standing to bring his avoidable transfer action and for recovery of avoided transfers; to request equitable subordination; to object to and seek disallowance of all claims; to assert breach of contract; to request attorneys' fees and costs; and to seek turnover of the CDs. Each cause of action and each remedy is explicitly retained by the confirmed plan and the approved disclosure statement, with AimBank named as a potential defendant.

The breach of contract claim that was assigned to the Debtors under a settlement with GM Financial is different from the other causes of action as it arose well after the bankruptcies were filed. The Court granted the 9019 settlement motion between the Debtors and GM Financial—in which GM Financial assigned its claims against AimBank to the Debtors—after the disclosure statement had been approved and the "toggle" plan voted-on. The existence of these claims appeared in a plan document for the first time on July 7, 2020. Although it is likely that AimBank was aware that the Debtors (and subsequently, the Trustee) had been assigned these claims, "actual knowledge of plaintiff's [] claim is, as a matter of law, not relevant to the issue of whether plaintiff has standing to pursue that claim because standing is governed by the sufficiency of the retention language in the plan documents." *Lauter*, 2018 WL 801601, at *12. But the approved disclosure statement reserved "contract theories of recovery,"[12] at that time; there is no way to more explicitly reserve a cause of action that had not yet been assigned.

The plan documents state that the Court retained jurisdiction "to adjudicate any and all Causes of Action that arose in the Case *prior* to the *Confirmation Date*." (Case No. 18-50214, ECF No. 1391 at 59) (emphasis added). It would be absurd to exclude from the reserved causes

---

[12] Case No. 18-50214, ECF No. 1390, Ex. E

of action a cause of action that arose (or became estate property) between the time the disclosure

statement was approved (or a chapter 11 plan voted-on) and confirmation. AimBank received

notice of the Debtor's motion to approve the settlement agreement with GM Financial and of the

order approving the settlement. Case No. 18-50214, ECF Nos. 1804, 1833. Under that

assignment, the Trustee brings a breach of contract claim. Breach of contract is a claim

preserved in the retained causes of action, and, as stated above, AimBank was listed by name as

a potential defendant. The Trustee has standing to bring the breach of contract claim against

AimBank based on GM Financial's claim that was assigned to the Debtors through a court-

approved settlement.

<u>Debtors' Schedules and Statement of Financial Affairs</u>

Last, AimBank contends that the Trustee does not have standing to bring any of the

claims asserted in the Complaint because none of the claims appear in the Debtors' schedules or

statement of financial affairs. This argument attempts to support AimBank's allegation that there

was not proper disclosure of the causes of action in the plan documents, and since there was not

adequate disclosure anywhere, "[j]udicial estoppel is appropriate in situations like this where the

debtor fails to timely disclose an asset and then post-petition pursues that cause of action." ECF

No. 41 at 9. In determining whether a cause of action has been properly reserved, courts look to

the disclosure statement and the plan. *See, e.g.*, *In re SI Restructuring Inc.*, 714 F.3d at 864

(citing *In re Tex. Wyo. Drilling, Inc.*, 647 F.3d at 551). As stated previously, the approved

disclosure statement and plan confirmation order contained explicit causes of action that the

Trustee now asserts against AimBank, which was explicitly listed as a potential defendant.

Because the Debtors "explicitly retained the same claims against the defendant[] that the trustee

is now pursuing, there is no inconsistency in its position" that would support a judicial estoppel argument. *In re Tex. Wyo. Drilling, Inc.*, 647 F.3d at 553.

B.

The motion to dismiss toggles between AimBank's argument that the causes of action should be dismissed for failure to state a claim under Rule 8 and its argument that the causes fail to state a claim under the heightened pleading standard of Rule 9.

Under Rule 8, a plaintiff must plead a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. Rule 8 does not require "detailed factual allegations," but it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

The heightened pleading standard of Rule 9(b) applies to causes of action that involve an element of fraud. Where the heightened pleading standard applies, the plaintiff "must plead the who, what, when, where, and why as to the fraudulent conduct." *Life Partners Creditors' Tr. v. Cowley (In re Life Partners Holdings, Inc.)*, 926 F.3d 103, 117 (5th Cir. 2019).

Before addressing specific claims, AimBank argues that the Complaint is deficient because the Trustee never pleads with any particularity any alleged "agreements" by which AimBank participated in and facilitated Shane Smith's kiting and sight draft schemes. ECF No. 41 at 13. This deficiency also undermines the Trustee's fraudulent transfer and equitable subordination claims, AimBank argues.

To the contrary, the Complaint more than adequately describes AimBank's actions—or failures to act when needed—that supported Shane Smith's and the Debtors' check-kiting

17

scheme.  The Complaint alleges how AimBank affirmatively participated with the Debtors by giving immediate credit on sight drafts and not requiring RD Snyder or RD Lamesa to submit the original certificates of title.  The Complaint explains the ways in which AimBank knew or should have known about the kiting and sight draft schemes.  *See* ECF No. 39 ¶¶ 35, 46.  For the heighted pleading standard under Rule 9(b), the fraudulent activity is alleged with particularity by alleging who (Shane Smith and various AimBank personnel such as Mike Tibbit), what (sight drafts), when (by an attached exhibit that includes the dates of every draft sought to be avoided along with dates of email communications), where (AimBank's location in Lubbock, over email, and in the bank accounts), and why (to enhance AimBank's numbers and negotiate a better deal for itself in acquiring another local bank).

C.

<u>Count One – Fraudulent Transfers</u>

The Trustee seeks to avoid certain allegedly fraudulent transfers under four different statutes: (1) § 548(a)(1)(A) [Actual Fraudulent Transfer]; (2) § 548(a)(1)(B) [Constructive Fraudulent Transfer]; (2) Texas Business & Commerce Code § 24.005 [Actual Fraudulent Transfer]; and (4) Texas Business & Commerce Code § 24.006 [Constructive Fraudulent Transfer].[13]

To begin, AimBank states that the Trustee has failed to allege the elements of either claim under the Texas Uniform Fraudulent Transfer Act (TUFTA) (Tex. Bus. & Com. Code §§ 24.005, 24.006) and has failed to apply the alleged facts for the elements of the TUFTA claims and therefore both claims should be dismissed since neither claim meets the pleading standards of Rules 8 or 9(b).

---

[13] The TUFTA claims are brought pursuant to § 544.

The Fifth Circuit has stated that for Rule 8, a plaintiff does not need to explicitly include every element of the plaintiff's prima facie case; the elements of the cause of action can be present by implication. *See Wooten v. McDonald Transit Assoc., Inc.*, 788 F.3d 490, 499 (5th Cir. 2015) (retaliation claim under the ADEA in default judgment); *Ventura v. Pro. Frame & Home*, No. 18-cv-02659, 2020 WL 7426156, at *1 n.1 (N.D. Tex. Dec. 18, 2020) (stating that a complaint is well pleaded when all the elements of a cause of action are present by implication); *Rivera v. United States*, No. 15-cv-00021, 2015 WL 5608113, at *3 (W.D. Tex. Sept. 22, 2015) (applied to a negligence claim on a motion to dismiss); *see also In re Stirlen*, 614 B.R. 837, 843 (Bankr. N.D. Ill. 2020) (stating that a plaintiff is not necessarily required to apply the alleged facts to each element of each cause of action, but rather "a plaintiff's complaint must include allegations about each element of the cause of action, or at least allegations from which a court can draw reasonable inferences about each element"). While application of alleged facts to each element in each cause of action would benefit the defendant, such precise application is not necessarily required under the law.

AimBank argues that the Trustee fails to adequately plead constructive fraudulent transfers under § 548(a)(1)(B) and § 24.006 of TUFTA because the Trustee did not allege that RD Snyder did not receive reasonably equivalent value for the transfers and failed to allege how the Debtors created these drafts to hinder, delay, or defraud creditors. Although the Complaint contains allegations that RD Snyder did not receive reasonably equivalent value for the transfers, such allegations are not required here because the check-kiting scheme was a "fraudulent Ponzi-like scheme" and any transfer in furtherance of such scheme "does not confer reasonably equivalent value as a matter of law." *In re Life Partners Holdings, Inc.*, 926 F.3d at 121. Similarly, the Complaint alleges that the Debtors used sight drafts to hinder, delay, and defraud

creditors. As the Court has stated in a related case, the alleged check-kiting scheme is Ponzi-like and thus enables the Court to infer fraudulent intent. *Reagor Auto Mall, Ltd. v. FirstCapital Bank of Tex., N.A. (In re Reagor-Dykes Motors, LP)*, No. 20-05002, 2020 WL 4939180, at *9 (Bankr. N.D. Tex. Aug. 24, 2020). The Trustee has sufficiently pleaded claims under § 548(a)(1)(B) of the Code and § 24.006 of TUFTA to survive AimBank's motion to dismiss.[14]

Next, AimBank states four reasons why the Trustee failed to adequately plead actual fraudulent transfers under § 548(a)(1)(A) and § 24.005 of TUFTA. First, AimBank alleges that the Trustee has failed to plead this cause of action with particularity as required under Rule 9(b). The second is that the Trustee did not plead any facts of the Debtors' intent to hinder, delay, or defraud creditors with these transfers. Third, AimBank says it was merely a conduit for any transfers.[15] Last, it contends that the Trustee does not plead any badges of fraud.

Although the Fifth Circuit has not addressed the necessary pleading standard for an actual fraudulent transfer under § 548(a)(1)(A), the majority of courts in the Fifth Circuit, and in other circuits, have applied Rule 9(b) to such claims. In conjunction with § 548(a)(1)(A), courts in Texas have applied the Rule 9(b) pleading standard to TUFTA § 24.005. *See In re Northstar Offshore Grp., LLC*, 616 B.R. 695, 733 (Bankr. S.D. Tex. 2020). While *Northstar* notes that the Fifth Circuit has yet to rule on this issue, the court determined that the heightened pleading standard was appropriate for § 548(a)(1)(A) and TUFTA § 24.005 because "Rule 9 applies whenever fraud is an essential part of the claim. In an *actual* fraudulent transfer case, fraud is an essential element. The Fifth Circuit has applied this reasoning in the § 523 fraud context." *Id.*

---

[14] The Complaint states, among other things, that the check-kiting scheme harmed creditors, specifically by enabling the Debtor dealerships to sell cars out-of-trust, and states the dollar-amount effect to GM Financial from RD Snyder's vehicles selling out-of-trust.

[15] AimBank also mentions that the Trustee does not allege how AimBank benefitted from its participation in the Debtors' check-kiting scheme. The Complaint, though, goes into great detail about how AimBank was in the process of acquiring another local bank and the bank's portfolio, specifically the volume of money going through AimBank's accounts, was important in the merger deal.

(emphasis in original) (citing *AT&T Universal Card Serv. v. Mercer (In re Mercer)*, 246 F.3d 391, 401–02 (5th Cir. 2001)). The fraud element of these claims is the actual intent to hinder, delay, or defraud creditors. Additionally, badges of fraud are generally pleaded to meet the Rule 9(b) requirement of actual intent to hinder, delay, or defraud creditors. So, the first, second, and fourth reasons for dismissal of the actual fraudulent transfer claim, according to AimBank, all argue the same thing.

The Trustee has met the Rule 9(b) pleading standard by pleading the who, what, where, when, why, and how of the fraudulent scheme. Additionally, as previously addressed, even though the Complaint does contain allegations of the Debtors' intent to hinder, delay, or defraud creditors, such allegations are not required in this instance where the check-kiting scheme allows the Court to infer fraudulent intent. Last, badges of fraud are not required to be pleaded to meet the Rule 9(b) pleading requirement. *Tronox Inc. v. Anadarko Petrol. Corp. (In re Tronox Inc.)*, 429 B.R. 73, 94 (Bankr. S.D.N.Y. 2010). They are merely "examples of indicators of actual fraudulent intent, culled from decades of case law." *In re Rollaguard Sec., LLC*, 591 B.R. 895, 918 (Bankr. S.D. Fla. 2018); *see also In re TMST, Inc.*, 610 B.R. 807, 826 (Bankr. D. Md. 2019) ("Badges of fraud are but one way, at the pleading stage, to fulfill the heightened pleading requirement of Rule 9(b).").

Last, AimBank refers to a maze of case law and statutes to argue, essentially, that it was not a transferee subject to this fraudulent transfer claim and was merely a conduit. The Court has previously addressed the mere conduit defense in the *FirstCapital* adversary proceeding. *See In re Reagor-Dykes Motors, LP*, 2020 WL 4939180, at *4 (mere-conduit argument "is an affirmative defense that is not appropriately considered on a motion to dismiss").

The Trustee has adequately pleaded a claim for fraudulent transfers under § 548(a)(1)(A) and (a)(1)(B) of the Bankruptcy Code, as well as §§ 24.005 and 24.006 of the Texas Business and Commerce Code. AimBank's motion to dismiss these claims will be denied.

Count Two – Recovery §§ 550 and 551

AimBank states that this count should be dismissed because Count One must be dismissed. Since Count One survives the motion to dismiss, Count Two also survives. The Court denies AimBank's motion to dismiss Count Two.

Count Three – Equitable Subordination

AimBank argues that the Trustee's equitable subordination claim should be dismissed for several reasons. The Complaint, according to AimBank, fails to adequately plead inequitable conduct, which must be pleaded with particularity under Rule 9(b). AimBank also alleges that the Complaint fails to identify a creditor that was harmed or how any such creditor was harmed. Last, AimBank believes that the Trustee must allege not only inequitable conduct (which AimBank says the Trustee has not alleged) but also facts regarding AimBank's alleged inequitable conduct that is specific to RD Plainview and RD Auto.

The Fifth Circuit has articulated three elements a plaintiff must establish for an equitable subordination claim, which in turn requires allegations of those same elements at the pleading stage, that (i) defendant engaged in some type of inequitable conduct, (ii) such misconduct caused injury to creditors or conferred an unfair advantage on the defendant, and (iii) equitable subordination of the claim is consistent with bankruptcy law. *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977).

Equitable subordination is not subject to Rule 9(b)'s heightened pleading standard. Several courts, including the Fifth Circuit in *In re Life Partners Holdings, Inc.*, have rejected

AimBank's argument that, because it is "fraud-based," an equitable subordination claim is subject to Rule 9(b). 926 F.3d at 122. This is because "'[e]quitable subordination claims, by their nature, do not require the establishment of fraud by the defendant.' Equitable subordination requires only 'inequitable conduct' on the part of the claimant, so [the Trustee] need only satisfy Rule 8(a) to adequately plead this claim." *Id.* (citation omitted).

The Complaint asks that all of AimBank's claims against the bankruptcy estates be equitably subordinated to the allowed claims of general unsecured creditors. This is based on AimBank's alleged inequitable conduct that harmed "the entire creditor body." ECF No. 39 ¶ 99. The Trustee has alleged inequitable conduct—that AimBank participated in and perpetuated Shane Smith's and the Debtors' check-kiting and sight draft schemes and that it knew, or should have known, that such practices were fraudulent given the amount of money funneling through the RD Snyder bank account in comparison to RD Snyder's actual annual sales. Additionally, the Complaint states that not only does the Trustee seek to recover the RD Plainview and RD Auto CDs but also asserts that "AimBank's claim against the certificates of deposit should be subordinated, and the lien securing said certificates transferred to the Liquidating Trust." *Id*. ¶ 77.

The Trustee alleges that creditors were harmed by the Debtors' check-kiting scheme.[16] Where a court can draw an inference based on the alleged facts that the creditor's inequitable conduct "makes it less likely that the general creditors will receive payments on their claims," the second element of equitable subordination is sufficiently pleaded. *Nisselson v. Ford Motor*

---

[16] "The claims docket in the Debtors' bankruptcy proceedings are filled with the claims of the many innocent victims of Smith's fraud. The injury to these innocent creditors was caused, at least in part, by AimBank's inequitable conduct in facilitating and assisting Smith with the check-kite and sight-draft schemes," "all to the detriment of the legitimate creditors of the Reagor Dykes debtors." ECF No. 39 ¶¶ 15, 59. "On the basis of the facts alleged above, by helping Shane Smith perpetuate the kite and sight draft schemes, AimBank engaged in serious inequitable conduct which injured the creditors of the Reagor Dykes entities." *Id*. ¶ 77.

*Co. (In re Monahan Ford Corp. of Flushing)*, 340 B.R. 1, 45 (Bankr. E.D.N.Y. 2006).  Here, the alleged accommodation by AimBank of the Debtors' fraudulent schemes allows the Court to infer that general creditors are less likely to receive payments (or less payments) on their claims. The Complaint also alleges that AimBank's inequitable conduct harmed GM Financial in an amount of over $3 million by enabling RD Snyder to sell cars out-of-trust.

Last, equitable subordination is a fact-intensive cause of action that is not generally susceptible to a motion to dismiss.  *In re Reagor-Dykes Motors, LP*, 2020 WL 4939180, at *12. AimBank wants the Trustee to allege facts that AimBank engaged in inequitable conduct "as to Plainview and Auto."  It is not entirely clear what AimBank wants—facts alleging that AimBank acted inequitably in its dealings with RD Plainview and RD Auto, that AimBank engaged in inequitable conduct on these specific accounts that harmed direct creditors of RD Plainview and RD Auto, or maybe something else?  AimBank offers no case law to support the demand of individualized equitable subordination pleadings.  Rather, the pleadings need to allege inequitable conduct, that harmed creditors, and that equitable subordination is not contrary to the Bankruptcy Code.  *In re Mobile Steel Co.*, 563 F.2d at 700.

The Trustee alleges that AimBank took money from other Debtor-entities when it paid RD Snyder's sight drafts.  This payment harmed those entities because they received no value for the transfers identified in the attached exhibit.  ECF No. 39, Ex. A.  The attached exhibit includes payments that were made by both RD Plainview and RD Auto.  The alleged inequitable conduct of taking money from the other Debtor-entities and the harm it caused their creditors is sufficient to overcome the motion to dismiss.

<u>Count Four – Disallowance of Claim</u>

Count Four survives AimBank's motion to dismiss so long as the Trustee has alleged a viable claim for avoidable transfers in Count One.  As the Trustee's claim for fraudulent transfers survives the motion to dismiss, so does the Trustee's claim for claim disallowance.

<u>Count Five – Breach of Contract</u>

The Trustee's allegations of AimBank's breach of contract are messy.  The basic charge is that AimBank's knowledge of—and to some extent its participation in—Debtors' float-creating schemes breached its warranty to GM Financial that there were no "perfected liens or encumbrances with respect to the Operating Account."  ECF No. 39 ¶ 62.  One problem here is whether "encumbrances" means something more than a type of lien or security interest.  If "perfected" modifies both "liens" and "encumbrances," the breach charge is questionable at best.

The Trustee also alleges that AimBank breached an implied duty of cooperation that arises from the Deposit Control Agreement.  He says that "AimBank breached this duty by actively facilitating Smith's fraudulent conduct" that undermined the basis of the entire contract.  ECF No. 39 ¶ 69.  The fraudulent kiting scheme enabled RD Snyder and AimBank to circumvent GM Financial's security interest in the account and assisted RD Snyder in breaching the Deposit Control Agreement by not remitting sales proceeds to GM Financial.

Courts construe unambiguous contracts as a matter of law.  *Cotton v. Tex. Express Pipeline, LLC*, No. 16-cv-00453, 2017 WL 3709093, at *6 (W.D. Tex. July 19, 2017) (determining the meaning and extent of an easement agreement on a 12(b)(6) motion to dismiss and dismissed plaintiff's claim for breach of contract based on the easement agreement).  A breach of contract claim requires proof of the following elements: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by

the defendant; and (4) damages to the plaintiff resulting from that breach." *Wells v. Minn. Life Ins. Co.*, 885 F.3d 885, 889 (5th Cir. 2018) (referring to Texas law).

Texas law imposes an implied duty to cooperate "in every contract in which cooperation is necessary for performance of a contract." *Bank One, Tex., N.A. v. Stewart*, 967 S.W.2d 419, 434 (Tex. App.—Houston [14th Dist.] 1998, pet. denied). When applicable, the duty to cooperate prohibits a party to a contract from hindering, preventing, or interfering with the other party's ability to perform his contractual duties. *Id.* at 435. More explicitly, "a duty to cooperate implies that one party will not prevent the other party from performing the contract." *Baerg Real Prop. Tr. v. Garland Sol., LLC (In re Baerg Real Prop. Tr.)*, 585 B.R. 373, 387 (Bankr. N.D. Tex. 2018) (case then recites in great detail an example from the Fifth Circuit that demonstrates what a breach of the duty to cooperate looks like). Inherent in a breach-of-duty-to-cooperate claim is that the claimant must allege that the act of the defendant prevented another party from performing a specific obligation under the contract.

"The purpose of a Rule 12(b)(6) motion is to test the formal sufficiency of the plaintiff's complaint, and should not be used to resolve factual issues or the merits of the case." *Ins. Distrib. Consulting, LLC*, 2020 WL 5803249, at *2 (citing *In re McCoy*, 666 F.3d 924, 926 (5th Cir. 2012)). To survive a Rule 12(b)(6) motion to dismiss a breach of contract claim, the plaintiff needs to allege "critical elements of a breach of contract claim: the existence of a contract, a breach of the contract, and resulting damages." *Rogers v. Standard Eco, LLC*, No. 20-cv-00216, 2020 WL 6392432, at *2 (S.D. Tex. Nov. 2, 2020). Additionally, the plaintiff needs to allege or show the contract or provision that the defendant breached. *See Adams v. Chase Bank*, No. 14-cv-3157, 2015 WL 2168127, at *4 (N.D. Tex. May 8, 2015).

The Trustee has pleaded the elements of breach of contract and breach of duty to cooperate. He provides a copy of the contract at issue, alleges a breach of the contract with reference to specific provisions in the contract that were breached, and alleges damages in the amount of over three million dollars.

As for the duty to cooperate, the application of this claim "touches on factual matters, such as 'the parties' real intentions,' whether 'cooperation [was] necessary for performance of a contract,' and whether the alleged actions 'hinder[ed], prevent[ed], or interfer[ed] with' the other party's ability to perform" which requires a fact-intensive analysis that is not appropriate at the motion to dismiss stage. *Miller v. Ret. Sys. Grp., Inc.*, No. 09-cv-834, 2011 WL 13340637, at *11 (S.D. Tex. Jan. 31, 2011).

How the alleged facts support the breach of contract claims raises several issues—what is the intended meaning of "encumbrances," how exactly did AimBank's involvement with the sight drafts breach the Deposit Control Agreement, and what conduct of AimBank *prevented GM Financial* from performing under the contract—but such issues are best considered on summary judgment or at trial.

<u>Count Six – Demand for Attorneys' Fees and Recovery of Costs</u>

AimBank moves to dismiss the Trustee's demand for attorneys' fees. The Trustee has pleaded claims under TUFTA. Under TUFTA, a court may award attorneys' fees "based on the evidence the trial court heard." *Janvey v. Dillon Gage, Inc. of Dall.*, 856 F.3d 377, 392 (5th Cir. 2017) (quoting *Walker v. Anderson*, 232 S.W.3d 899, 919 (Tex. App.—Dallas 2007, no pet.)) (discussing Tex. Bus. & Com. Code § 24.013). A sufficiently pleaded claim under TUFTA may likewise support a claim for attorneys' fees under TUFTA.

Chapter 38 of the Texas Business & Commerce Code also authorizes recovery of attorneys' fees for breach of contract.

The Court denies AimBank's motion to dismiss the Trustee's claim for attorneys' fees.

<u>Count Seven – Return of Certificates of Deposits</u>

The cause concerns the Trustee's demand for return of two CDs, one owned by RD Plainview in the amount of $514,477.58, and one owned by RD Auto in the amount of $541,776.91. The CDs are subject of a prior agreement between the parties that the stay be lifted to allow AimBank's setoff of the two CDs. The agreement was to be evidenced by a conforming order submitted by the parties. Unfortunately, the parties never submitted the order. The record indicates that the agreed setoff did not prejudice the respective Debtors' rights to seek a clawback of the funds or return of the CDs. The Court denies AimBank's motion to dismiss Count Seven.

<u>Judgment on the Pleadings</u>

AimBank asks that if the Court considers this motion to dismiss to be a motion for judgment on the pleadings under Rule 12(c) or considers extrinsic documents that convert this motion to a motion for summary judgment, the Court give notice to the parties and consider all evidence presented. The Court leaves it for the parties to decide whether to file motions for summary judgment.

<u>Motion to Strike</u>

AimBank, as a part of its motion to dismiss, moved to strike three paragraphs in the Complaint. The brief in support of the motion did not address AimBank's motion to strike. The paragraphs AimBank wishes to strike are paragraphs 106, 129, and 130. ECF No. 40 at 7. Paragraph 106 discusses the Trustee's investigation of fraud allegations raised by Ford Motor

28

Credit. Paragraphs 129 and 130 are a reservation of rights, essentially stating that the Trustee may amend the Complaint to include allegations that are uncovered during discovery. Rule 12(f) states that "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "The decision to grant or deny a motion to strike lies within the sound discretion of the trial court." *Morales v. Gomez*, No. 14-cv-00189, 2014 WL 12889928, at *1 (W.D. Tex. July 14, 2014).

"The Fifth Circuit has stated that motions to strike are generally disfavored." *Glenn Paul Shoop Tr. v. Devon Energy Prod. Co., L.P.*, No. 10-cv-00650, 2010 WL 11562101, at *2 (N.D. Tex. Dec. 9, 2010) (citing *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards*, 677 F.2d 1045, 1058 (5th Cir. 1982)). "A motion to strike 'is a drastic remedy to be resorted to only when required for the purposes of justice' and 'should be granted only when the pleading to be stricken has no possible relation to the controversy.'" *Biosonix, LLC v. Hydrowave, LLC*, No.16-cv-139, 2016 WL 9241284, at *1 (E.D. Tex. Aug. 5, 2016) (quoting *Augustus v. Bd. of Pub. Instruction of Escambia Cnty., Fla.*, 306 F.2d 862, 868 (5th Cir. 1962)).

The Court finds no reason to grant AimBank's motion to strike and therefore denies the motion.

IV.

The Court denies AimBank's motion to dismiss and declines to convert AimBank's motion to a motion for judgment on the pleadings or for summary judgment. The Court will issue its order in conformance with this memorandum opinion.

### End of Memorandum Opinion ###