| | |
|---|---|
| Richard A. Illmer | Lynn Hamilton Butler |
| **HUSCH BLACKWELL LLP** | **HUSCH BLACKWELL LLP** |
| 1900 N. Pearl Street, Suite 1800 | 111 Congress Avenue, Suite 1400 |
| Dallas, Texas 75201 | Austin, Texas 78701 |
| t: 214.999.6100 | t: 512.479.9758 |
| f: 214.999.6170 | f: 512.226.7318 |
| Rick.Illmer@huschblackwell.com | Lynn.Butler@huschblackwell.com |

*Counsel for FirstBank & Trust f/k/a AimBank and Nonparty Heartland Financial USA, Inc.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | | |
|---|---|---|
| IN RE: REAGOR-DYKES MOTORS, LP ET AL., <br> *Debtor.* | § § § § | Case No. 18-50214-RLJ-11 <br> Chapter 11 |
| DENNIS FAULKNER, TRUSTEE OF REAGOR-DYKES AUTO GROUP CREDITORS LIQUIDATING TRUST, <br> *Plaintiff,* <br> v. <br> AIMBANK, <br> *Defendant.* | § § § § § § § § § § § | Adversary Proc. No. 20-05039-RLJ |

**AIMBANK'S REPLY TO PLAINTIFF'S RESPONSE TO**
**AIMBANK'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant, AimBank, hereby files its Reply to Plaintiff's Response (the "Plaintiff's Response") to AimBank's Motion for Partial Summary Judgment (the "Motion") against Plaintiff, Dennis Faulkner ("Plaintiff" or "Trustee"), and respectfully shows the court as follows:

**I. SUMMARY**

1. The Plaintiff's Response sets forth a litany of disputed facts, none of which are relevant to the issues presented in the Motion. For example, the CD-secured loans are not the

subject of the causes of action addressed in the Motion, nor is the Reagor Dykes check kiting scheme or AimBank's alleged role in it. *See* Pl. Resp. at 1-2.[1]

2. The only causes of action addressed in the Motion are: (1) breach of contract (whether AimBank breached the Deposit Account Control Agreement ("DACA")) and (2) fraudulent transfer (whether payments made to AimBank by various Reagor Dykes entities (the "RD Purchasers") that purported to purchase vehicles from Reagor Dykes Snyder ("RDS") constitute fraudulent transfers). As to these causes of action, the Plaintiff's Response fails to raise a genuine issue of material fact and summary judgment is proper for the following reasons:

- Alleged Breach of the DACA:
    - The DACA was not breached.
        - No perfected liens or encumbrances existed when the DACA was executed.
        - GM Financial did not request, and AimBank did not fail to provide, cooperation under the DACA.

- The Fraudulent Transfer Claims
    - Under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), there was no transfer subject to avoidance.
    - Under 11 U.S.C. § 548, RDS and the RD Purchasers had an identify of interest. As a result, the RD Purchasers received dollar-for-dollar credit for each payment they made, which precludes a claim of constructive fraudulent transfer.
    - The Trustee does not have standing to complain about the Transfers.

---

[1] AimBank played no role in the Reagor Dykes check kiting scheme. Plaintiff's position is that AimBank knew or should have known about the check kiting scheme (which AimBank denies) and should have stopped it. But, Plaintiff also claims Ford knew or should have known, Vista Bank knew or should have known, and First Capital Bank knew or should have known. With the benefit of hindsight, Plaintiff blames the victims of the check kiting scheme for its existence. It is not credible that all of these banks knew about and ignored the kiting.

## II. ARGUMENTS

A. **AimBank Did Not Breach the DACA.**

  1. **Unasserted, hypothetical, claims by unidentified third parties are not "encumbrances".**

  3. Plaintiff's assertion that "claims are encumbrances", Pl. Resp. at 37, does nothing to advance Plaintiff's cause because no claims existed when the DACA was executed. A "claim" does not exist until it is asserted; that is, until it is known. A hypothetical, unasserted right by an unidentified person does not constitute a "claim" or encumbrance. There is no legal authority to the contrary. The cases cited by Plaintiff are easily distinguished. *See Lemon v. Hagood*, 545 S.W.3d 105, 125 (Tex. App.—El Paso 2017, pet. denied) (holding that a contingency interest could meet the definition of encumbrance); *Stahl v. Crouch Enterprises, Inc.*, No. 07-97-0371-CV, 1998 WL 870369, at *3 (Tex. App.—Amarillo Dec. 15, 1998, no pet.) (involving a right of first refusal as an encumbrance)*; H. E. Butt Grocery Co. v. Justice,* 473 S.W.2d 77, 79 (Tex. Civ. App.—Waco 1971, no writ) (involving a use restriction as a encumbrance on property); *Latham v. Miller*, 250 S.W.2d 302, 304 (Tex. Civ. App.—Austin 1952, no writ) (holding that a lease contract constituted an encumbrance on title of land); *City of Dayton v. Allred*, 123 Tex. 60, 68, 75 S.W.2d 172, 179 (Comm'n App. 1934) (holding that a mortgage on the income of a utility plant would constitute an encumbrance); *United States v. Reed*, 668 F.3d 978, 982 (8th Cir. 2012) (case involving the filing of false or fictitious liens or encumbrances against the real or personal property of government officials, explaining that encumbrances and liens have "a universally accepted meaning in this country," describing an encumbrance as "a claim or liability that *attaches to property, usually though not always real property*")(emphasis added); *In re Paragon Trade Brands, Inc.,* 324 B.R. 797, 820 (Bankr. N.D. Ga. 2002), *rev'd sub nom. Weyerhaeuser Co. v. Lambert*, No. CIVA 105-CV-1144-JEC, 2007 WL 2826957 (N.D. Ga. Sept. 26, 2007) (finding that *a patent is an*

*encumbrance* and, as such, the patent-holder's rights that allowed them to threaten patent infringement constituted encumbrances) (emphasis added), *aff'd sub nom. In re Paragon Trade Brands, Inc.*, 278 Fed. Appx. 1000,1000 (11th Cir. 2008).

4. Plaintiff's use of Texas case law to support his broad definition of what constitutes an encumbrance is unpersuasive because the case law cited in his Response discuss an encumbrance as the term is understood by its plain, ordinary, and generally accepted meaning (usually in the context of an encumbrance on real property). What Plaintiff advocates for is a new meaning not set forth in the case law, specifically that encumbrances include unknown and unasserted claims. None of the authority cited in Plaintiff's Response is factually similar or conceptually analogous to the present case to support his argument. The Court should reject Plaintiff's attempt to stretch the meaning of encumbrance beyond its plain, ordinary, and generally accepted meaning.

5. Plaintiff heavily cites to *City of Beaumont v. Moore* to support the proposition that, the term encumbrance "is broader and more comprehensive than the term 'lien'," however the court there made that statement in the context of its decision in another case where it found that a mortgage on the income of a waterworks plant was an encumbrance on the plant. *See* Pl. Resp. at 37-38; *City of Beaumont v. Moore*, 146 Tex. 46, 55, 202 S.W.2d 448, 454 (1947) (citing *City of Dayton v. Allred*, 123 Tex. 60, 73, 68 S.W.2d 172, 179 (Comm'n App. 1934)). Based on *Moore*, Plaintiff claims that "the only requirements for a claim to constitute an encumbrance are: (1) the claim 'rest[s] on the property itself, or on its title,' and (2) the claim either: (a) lessens the value of the property, or (b) interferes with the free enjoyment of the property," but Plaintiff fails to acknowledge that the court in *Moore* was addressing a royalty interest encumbered by a servitude. Pl. Resp. at 38; *Moore*, 146 Tex. at 57. Accordingly, the *Moore* case does not advance Plaintiff's

argument because that case is in no way analogous to the present circumstances, nor has Plaintiff cited to any other analogous authority.

6. When Plaintiff asserts, "AimBank asks the Court to interpret "encumbrance" to only include security interests arising from outstanding claims," it mischaracterizes AimBank's position. *See* Pl. Resp. at 39. AimBank does not assert that only security interests can be encumbrances. A creditor could make an unsecured claim against the account and then have it be an encumbrance against the account. For example, a garnishment order could encumber the account. But this court should reject Plaintiff's assertion that *all* that is required under Texas law to constitute an encumbrance is the existence of a vague, hypothetical, unasserted "right" by an unidentified "creditor." *See id.* at 40 ("All that matters is that the encumbrance-holder have a ***right*** to assert a claim."). Remarkably, Plaintiff makes this statement without identifying a single "encumbrance-holder" with a claim or right against the RDS Operating Account, much less a right that was asserted against the account at the time.

7. Lastly, Plaintiff dismisses, but does not dispute, AimBank's argument that GM Financial had a superior security interest in the Operating Account over any alleged creditor with a claim. The Court should not be misled by Plaintiff's dismissal of this point as a "red herring," as an essential element to a breach of contract claim is *damages*. *Turner v. Ewing*, 625 S.W.3d 510, 518 (Tex. App.—Houston [14th Dist.] 2020, n.p.h.) ("A breach of contract claim requires four elements be proven: . . . (4) **the plaintiffs sustained damages as a result of the defendants' breach**.") (emphasis added); *see* Pl. Resp. at 44. As GM Financial held a superior security interest, via control, if it so elected, it held priority over any conflicting interests held by a secured party that did not have control. *See* U.C.C. § 9-327(1). Thus, even if, *arguendo*, there were claims against

the RDS Operating Account, those claims would have been subordinated to GM Financial's superior interest and GM Financial would not have suffered damages as a result of those claims.

8.  As a result, the Court should grant AimBank summary judgment on Plaintiff's breach of contract claim.

> **2. AimBank did not breach its duty to cooperate under the DACA and Plaintiff's new claim is not properly before the Court.**

9.  As outlined in AimBank's Motion, it did not hinder, prevent, or interfere with GM Financial's performance under the DACA. *See* AimBank's Mot. Partial Summ. Judg. at ¶¶ 41-45. Plaintiff's Response fails to identify how any act by AimBank interfered with GM Financial's ability to perform under the DACA. In fact, Plaintiff seemingly does not dispute that AimBank did not breach its duty to cooperate under the DACA, at least as it pertains to GM Financial.

10. In his Response, Plaintiff for the first time raises a new theory, not set forth in any of its pleadings---that AimBank interfered with RDS' performance under the DACA. Pl. Resp. at 47. AimBank did not address RDS's performance under the DACA ***because Plaintiff never raised it in its pleadings.*** Plaintiff's Second Amended Complaint claims that AimBank "breached the DACA, deprived GM Financial of the very benefits and protections the DACA provided GM Financial, *and made GM Financial's performance under the contract impossible.*" Pl's Sec. Am. Compl. ¶ 69 (emphasis added). Plaintiff's Second Amended Complaint also states that "AimBank further breached its duty of cooperation with GM Financial under the DACA by actively assisting Smith and Reagor Dykes Snyder, LP in breaching the dealerships obligations thereunder, and consequently *making G.M. Financial's performance under the agreement impossible*." *Id.* at ¶ 113 (emphasis added). As to Plaintiff's claim that AimBank interfered with and prevented RDS from performing its obligations under the DACA, the Court should wholly ignore this claim, as it is not a proper claim before the Court. *See Cutrera v. Bd. of Sup'rs of Louisiana State Univ.*, 429 F.3d

108, 113 (5th Cir. 2005) ("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court."). AimBank cannot be expected to address claims that were never asserted.

11. Therefore, there is no genuine issue of material fact as to Plaintiff's breach of duty of cooperation claim (as it pertains to GM Financial) because AimBank presented ample evidence, which Plaintiff's Response does not dispute, that AimBank **did not** prevent, hinder, or interfere with GM Financial's ability to perform *any* of GM Financial's obligations under the DACA, Thus, the Court should grant AimBank's Motion for Partial Summary Judgment on Plaintiff's DACA claim.

**A.    Summary Judgment On The TUFTA Claim is Proper.**

    **3.    AimBank had a valid lien in the sight drafts and their proceeds.**

12. Plaintiff's claim of fraudulent transfer under TUFTA fails as a matter of law. In relevant part, TUFTA provides that a "transfer" is fraudulent if the debtor made the transfer with the requisite intent or without receiving reasonable equivalent value for the transfer. Tex. Bus. Com. Code § 24.005(a). TUFTA defines "transfer" as the disposition of an asset, and defines "asset" as property of a debtor *except for* property encumbered by a valid lien. TEX. BUS. & COM. CODE § 24.002 (2)(A)(emphasis added); *id.* at § 24.002(12). Stated differently, and as Plaintiff concedes, property encumbered by a valid lien is not subject to avoidance as a fraudulent transfer action under TUFTA. *See id.; see also* Pl. Resp. at 17 ("...unlike TUFTA, the existence of a valid lien does not preclude the existence of a transfer.") and 19 ("Unlike TUFTA, which does not permit the avoidance of a transfer of property subject to a valid lien…").

13. Here, the property at issue—the sight drafts and their proceeds—were encumbered by AimBank's valid lien. More specifically, AimBank's lien arose under TEX. BUS. & COM. CODE

§ 4.210 (a), which provides that "[a] **collecting bank** has a security interest in an **item** and any accompanying documents or the proceeds…".

14. Plaintiff does not dispute that a sight draft is an "item", *see* Pl. Resp. at 22 (acknowledging sight draft as item)*; see also* TEX. BUS. & COM. CODE § 4.104 (9) (defining "item"). It is likewise indisputable that AimBank handled the item (sight drafts) for collection and is, therefore, a "collecting bank". *See* TEX. BUS. & COM. CODE § 4.105 (5) (defining "collecting bank" as "a bank handling an item for collection except the payor bank.").

15. Plaintiff's reliance on *Singer Products* for the proposition that AimBank is not a "collecting bank" is misplaced. *See* Pl. Resp. at 23. In that case, First American Bank of New York ("FABNY") claimed a lien in certain sight drafts by virtue of being a "collecting bank" that had "handled" the sight drafts. *Singer Prods. Co. v. First Am. Bank (In re Singer Products Co.),* 102 B.R. 912, 929-30 (Bankr. E.D.N.Y. 1989). FABNY made this claim despite the fact that it *never had possession of the sight drafts themselves*. *Id.* at 930. The Court rejected FABNY's argument, reasoning that the bank could not have "handled" the sight drafts if it never had possession of them or any of the related documents. *Id*. at 933.

16. Here, of course, AimBank not only possessed the sight drafts, but it presented them to the RD Purchasers who honored them. Plaintiff's Second Amended Complaint admits as much. *See* Pl. Second Am. Compl. at ¶ 43 ("The second step of the [sight draft] process began when AimBank transmitted the draft to the "purchasing" dealership's bank."). AimBank is indisputably a "collecting bank" such that it had a lien on the "items" at issue—the sight drafts—and the proceeds of same. Therefore, there can be no "transfer" to support avoidance under TUFTA, and Plaintiff's claim for fraudulent transfer fails as a matter of law.

### 4. AimBank's lien was not created as part of a fraudulent transaction.

17. As set forth above, AimBank's lien in the sight drafts and their proceeds is created by statute. Plaintiff's argument otherwise—that the lien was "created as part of a fraudulent transaction"—is patently frivolous. *See* Pl. Resp. at 20-21. In each of the cases Plaintiff cites to support this flawed position, the liens at issue were created by, and for the benefit of, a party engaged in fraudulent conduct. *See id.* (citing *Matter of 3 Star Props., L.L.C.*, 6 F.4th 595 (5th Cir. 2021); *Mullins v. TestAmerica, Inc.*, 564 F.3d 386 (5th Cir. 2009);[2] *Maiden Biosciences, Inc. v. Document Sec. Sys., Inc.,* No. 3:21-CV-0327-D, 2021 WL 5416603, at *5-*6 (N.D. Tex. Nov. 19, 2021)).

18. Here, there are no allegations that AimBank acted fraudulently in the creation of the lien or participated in the Reagor-Dykes' fraudulent scheme in any way, at any point, for any purpose. *Cf. Maiden Biosciences,* 2021 WL 5416603, at *5-*6. AimBank's lien was not itself a fraudulent transfer nor did it arise from one, *cf. 3 Star Props.,* 6 F.4th at 608-09, nor did AimBank's lien facilitate the alleged fraudulent transfer. *Cf. Tel. Network,* 80 S.W.3d at 608-09.

19. Simply put, AimBank's lien is the product of statute, not fraud—much less fraud by AimBank. For this reason, and those set forth above, the lien is valid and dispositive of Plaintiff's claim for fraudulent transfer under TUFTA.

---

[2] Plaintiff quotes *Mullins* for the proposition that "if the circumstances surrounding the lien's creation are themselves part of the alleged fraudulent transfer, the lien is invalid". Pl. Resp. at 20. Contrary to Plaintiff's representation, this is not the *Mullins* holding, but rather one sentence of dicta, with a citation (which Plaintiff omitted) to *Tel. Equip. Network, Inc. v. TA/Westchase Place*, *Ltd.* 80 S.W.3d. 601, 609 (Tex. App.—Houston [1st Dist.] 2002, no pet.). *See* i*d.; Mullins*, 564 F.3d at 417. *Tel. Network* is no more helpful to Plaintiff than *Mullins*. In *Tel. Network*, in considering an appeal from an injunction ruling, the court upheld the trial court's finding of a probable right of recovery on the plaintiff's TUFTA claim where the disputed security interest was "an integral part of the alleged fraudulent transfer of assets" and there was "significant evidence" of the purported lienholder's intent to defraud creditors. 80 S.W.3d. at 608-10.

### 5. Plaintiff's "Documentary Draft" discussion is a red herring.

20. Plaintiff attempts to muddy the very clear waters by fabricating from whole cloth its own definition of "collecting bank". According to Plaintiff, with respect to sight drafts, a "collecting bank" must ensure that sight drafts are accompanied by original title documents. Pl. Resp. at 22. As set forth above, not only does this fly in the face of the unambiguous statutory definition of "collecting bank", but it relies on a completely made-up definition of "documentary draft", which TEX. BUS. & COM. CODE § 4.104(a)(6) defines as follows:

> "Documentary draft" means a draft to be presented for acceptance or payment if specified documents, certificated securities (Section 8.102) or instructions for uncertificated securities (Section 8.102), or other certificates, statements, or the like are to be received by the drawee or other payor before acceptance or payment of the draft.

Nowhere in that definition—or elsewhere in the TUFTA—does it say that "specified documents" necessarily involves certificates of title, much less *original* certificates of title as Plaintiff argues. *See* Pl. Resp. at 11; 23.[3] Rather, the parties to the transaction (the buyer and seller) determine what "specified documents" must accompany documentary drafts in order to obtain payment. Indeed, TEX. BUS. & COM. CODE § 5.102, comment 2 (referred to by comment 5 to § 4.104), states as follows:

> The definition of "document" contemplates and facilitates the growing recognition of electronic and other nonpaper media as "documents," however, for the time being, data in those media constitute documents only in certain circumstances. For example, a facsimile received by an issue would be a document only if the letter of credit expressly permitted it, if the standard practice authorized it and the letter did not prohibit it, *or the agreement of the issuer and beneficiary permitted it*.

---

[3] In some portions of its Response, Plaintiff suggests that "documents of title" are required for "documentary drafts." *See, e.g.,* Pl. Resp. at 11 ("A sight draft is a form of documentary draft. At its heart, it is payment against documents of title."). To the extent Plaintiff intends "documents of title" in these instances to have the meaning given to such phrase by Tex. Bus. & Com. Code § 1.201(16), Plaintiff is squarely incorrect. There is no authority for the position that sight drafts must be accompanied by "documents of title". To the contrary, courts (and Plaintiff) have recognized that sight drafts may be accompanied by a Manufacturer's Statement of Origin (MSO) or certificates of title, *In re C.M. Turtur Investments, Inc.*, 93 B.R. 526, 529 (Bankr. S.D. Tex. 1988); Pl. Resp. at 20, neither of which is a "document of title". *In re: C.M. Turtur Invs., Inc.,* 883 F.2d 35, 37 (5th Cir. 1989) (noting that MSOs and certificate of titles are not "documents of title" as such term is defined by the UCC because they do not import bailee status).

(Emphasis added.) Here, as evidenced by the fact that the payments were made by the RD Purchasers, RDS and the RD Purchasers agreed a photocopy of the car title was an acceptable document to accompany the sight drafts. Thus, even if there was some requirement that AimBank "handle" the sight drafts' attendant documents in order to be a "collecting bank" (which there is not), such documents need not include original certificates of title, and AimBank met any such requirement through its handling of copies.

### 6. *Turtur* is inapposite.

21. AimBank does not claim a lien relating to the certificates of title or the sale of cars; rather, pursuant to TEX. BUS. & COM CODE §4.210 (a) AimBank's lien was in the item (the sight draft) and its proceeds. Plaintiff's characterization of AimBank's lien as anything else ("in the proceeds of the sale of the certificates of title") is simply inaccurate, and its citation to *Turtur* is inapposite. *See* Pl. Resp. at 23; *In re: C.M. Turtur Invs., Inc.*, 883 F.2d 35, 37 (5th Cir. 1989) (holding collecting bank's statutory lien did not extend to the certificates of title and the proceeds from the sale of each car).

### C. The "Identity of Interests" Doctrine Precludes A Claim of Constructive Fraudulent Transfer Under § 548.

22. It is ironic that the Trustee seeks to recover money from AimBank for the RD Purchasers who were complicit in the Reagor Dykes fraud. Because the Debtors, including RDS and the RD Purchasers were part of a single economic enterprise, and the same fraudulent scheme, the Plan expressly rejected all intercompany claims. Third Amended Chapter 11 Plan of Liquidation, § 5.14 (all Intercompany Claims shall be cancelled…they are deemed to be rejected). Indeed, the alleged purpose of the fraudulent kiting scheme was to gain additional "float" to help keep the business from failing.

23. The Plaintiff does not dispute that RDS and the RD Purchasers were part of a single economic enterprise with a complete identity of economic interests. Indeed, the economic interests of the Debtors, including RDS and the RD Purchasers, are so related that RDS and the RD Purchasers are deemed to have an identity of interests, despite any corporate separateness. *See In re Able Body Temp. Services, Inc.*, 626 B.R. 643, 661 (Bankr. M.D. Fla. 2020). The Plaintiff did not offer any evidence to raise a genuine issue of material fact on this issue. The Plaintiff did not submit any evidence that the Debtors' have economic "separateness".

24. The same facts that necessitated rejecting intercompany claims also require the court to reject the notion that the RD Purchasers had an economic identity separate from RDS. What benefitted one Reagor Dykes entity benefitted all Reagor Dykes entities. *See Able Body*, 626 B.R. at 661 ("The identity of interest doctrine recognizes that the facts may suggest that a corporate group has purposely availed itself of the benefits of an enterprise and should be treated as one borrowing unit *even though each member of the enterprise is a separate entity*.") (quoting *In re TOUSA, Inc.*, 444 B.R. 613, 654, n. 43 (S.D. Fla. 2011) (quoted in *In re PSN USA, Inc.*, 2011 WL 4031147, at *6 (Bankr. S.D. Fla. Sept. 9, 2011) (emphasis added)).

25. The Court must consider the *economic realities* of the entities. To name a few, the Reagor-Dykes entities were consolidated under the Reagor-Dykes Auto Group ("RDAG") moniker and controlled by two owners,[4] RDAG issued combined financials,[5] Shane Smith was the Chief Financial Officer over RDAG,[6] and the nature of the RDAG business motto (i.e., "any car" you want, RDAG can get it) necessitated extensive intercompany interaction. The interconnected nature of the Debtors, including RDS and the RD Purchasers, is indisputable. For that reason, when

---

[4] *See* AimBank's Mot. Partial Summ. Judg. at ¶ 59.
[5] *See* Pl. Resp. at p. 6 n. 32 (Combined Financial – RDAG 12-31-17 Consolidated (TIBBIT_00001233), Exh. 19, App'x 0598).
[6] *See* AimBank's Mot. Partial Summ. Judg. at ¶ 5.

the payments to AimBank satisfied AimBank's statutory lien on the proceeds of each draft, the RD purchasers benefitted dollar-for-dollar with RDS. There is no genuine issue of material fact on this point and no evidence to raise any such fact issue.

D.     **Plaintiff Does Not Have Standing Because He Has Not Suffered an Injury in Fact**

26.     The Plaintiff does not have standing to pursue his alleged fraudulent transfer claims because they are based on sight draft transactions between related entities that are so intertwined that any benefit to one is a benefit to the other, and, as such, the transactions did not result in an injury to either Plaintiff or any of the creditors of the bankruptcy estate (the "Creditors"). That is, even ignoring the fact that the sight draft transactions between the RD Purchasers and RDS were dollar-for-dollar exchanges, because the RD Purchaser entities were so interconnected, reasonably equivalent value is presumed to be an indirect benefit by virtue of the economic relatedness of the entities.

27.     In any case, Plaintiff has failed to present any evidence of an injury in fact. Were an injury suffered by any Creditor on account of the sight draft transactions, presumably, Plaintiff would be able to identify the Creditors[7] and the concrete and particularized nature of the alleged injury suffered. *See generally In re Mirant Corp.*, No. 03-046590 DML, 2010 WL 8708772, at *7 (Bankr. N.D. Tex. Apr. 22, 2010) (explaining that "to have standing, and therefore a justiciable case or controversy, the plaintiff must show: (1) that it has suffered an injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury is fairly

---

[7] In *In re Manhattan Inv. Fund Ltd.,* the court explained that when determining whether an alleged fraudulently transferred asset constituted an interest of the debtor in property within the meaning of § 548(a)(1)(A), it previously concluded that "a definition of property that 'requires the fraudulent transfer to have actually harmed at least one creditor' best served the purpose of the Bankruptcy Code. 397 B.R. 1, 8 (S.D.N.Y. 2007) (quoting *Bear, Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 195 (S.D.N.Y. 2002)). The court further explained its conclusion, stating that "§ 548(a)(1)(A) only permits a trustee to avoid a transfer of an interest of the debtor in property when, but for the transfer, such property interest would have been available to at least one of debtor's creditors." *Id.* (quoting *Gredd I*, 275 B.R. at 196). Accordingly, it is necessary to Plaintiff's fraudulent transfer claims that he identify the allegedly injured Creditors, which he has failed to do.

traceable to the challenged action; and (3) it is likely that the injury will be redressed by judicial action."). But Plaintiff does not—and cannot—identify any Creditor injured because of the sight draft transactions, let alone the details of their alleged injury. Plaintiff even goes as far as stating that "each of the [RD Purchasers] all have had and continue to have creditors whose claims have not been paid in full." Pl. Resp. at 31. (citing D. Faulkner Decl. ¶ 8, at 2, Exh. 39, App'x 0825).

28. However, Plaintiff does not state what Creditors, or class of creditors, were affected by what transactions identified in Exhibit A of his Second Amended Complaint, nor does he articulate what injury resulted to those Creditors as a consequence of any particular transaction.

29. This is simply because Plaintiff does not have evidence of any injury to any Creditor of the RD Purchasers as a result of the sight draft transactions. As such, Plaintiff has failed to present *any* evidence to raise a genuine issue of material fact that he, or any Creditor, has suffered an injury as a result of the sight draft transactions.

30. Seemingly, Plaintiff's argument is the result of Plaintiff's misunderstanding of the underlying transactions. For example, Plaintiff's statement that "none of the funds transferred to AimBank for which avoidance is sought were returned to the transferor" demonstrates his confusion regarding the sight draft transactions because he fails to recognize that AimBank is only acting as a conduit for the transaction between RDS and the RD Purchaser. Pl. Resp. at 31. Plaintiff characterizes the portion of the transaction between AimBank and the RD Purchaser as the satisfaction of a debt owed by RDS, which is incorrect because it does not distinguish between the satisfaction of a debt and, as occurred here, a realization on a security interest. *See id*. AimBank was merely the channel through which sight draft transactions were facilitated.

31. In short, AimBank advanced a provisional credit to RDS on the sight draft, acted as a collecting bank by handling the item, obtained a statutory security interest in the sight draft

(the item) and its proceeds, and received payments from RD Purchasers in satisfaction of AimBank's security interest in the item. TEX. BUS. & COM. CODE §§ 4-105(5), 4.210 (a)(1)-(2); *See Turtur,* 883 F.2d at 37 ("There is no dispute that the sight drafts are 'items.'"). Indeed, AimBank acted as the conduit through which RDS and the RD Purchasers transacted to exchange payment for a vehicle. When AimBank received payment from the RD Purchaser in satisfaction of AimBank's security interest in the sight draft, that payment was tantamount to giving AimBank notice that the RD Purchaser received all that was required by it to complete its transaction with RDS.

32. As a matter of law, AimBank was a collecting bank handling an item that it held a security interest in, and payments made by the RD Purchasers were not payments on a debt, rather, they were realizations on a security interest. Consequently, Plaintiff does not have standing to avoid any of the transactions identified in Exhibit A of his Second Amended Complaint because there has been no injury in fact and "any injury to [the Creditors] is purely conjectural or hypothetical." *In re Mirant Corp.*, No. 03-046590 DML, 2010 WL 8708772, at *7-8 (Bankr. N.D. Tex. Apr. 22, 2010) (citing *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir.2001) (per curiam).

33. In addition, the cases cited by Plaintiff to support the principle that trustees are not precluded from seeking to avoid fraudulent transfers in which the debtor had actual intent to hinder or defraud its creditors are factually distinguishable and inapplicable to the present case. *See* Pl. Resp. at 31. For example, Plaintiff cites *In re Fordu*, in which the Bankruptcy Appellate Panel there determined whether the trustee was precluded from litigating the issue of reasonably equivalent value because of a dissolution decree in a prior proceeding establishing that a former husband and wife's separation agreement was fair, just and equitable. *See In re Fordu*, 209 B.R.

854, 857(B.A.P. 6th Cir. 1997), aff'd, 201 F.3d 693 (6th Cir. 1999). However, the legal principal Plaintiff refers to from the *In re Fordu* case does not account for the identify of interests between RDS and the RD Purchasers, which is a legal distinction that is critical to address because it demonstrates that the RD Purchasers received reasonably equivalent value in the transaction by virtue of their identify of interest, thereby precluding any indication that any Creditor of the RD Purchaser suffered any injury. *See Able Body*, 626 B.R. at 662 (explaining that an indirect benefit was received by virtue of the debtors' identify of interest, stating that "the indirect benefits constitute reasonably equivalent value.").

34. Plaintiff admits as much in his Response, stating that the identify of interest doctrine is an exception that explains where two entities are so closely related that a benefit to one will benefit the other to some degree, and, as such, receipt of reasonably equivalent value may be inferred. *See* Pl. Resp. at 27. Accordingly, *In re Fordu* is inapplicable to the present circumstances, as is *In re Financial Res. Mortg., Inc.* for the same reason.

35. Therefore, to the extent Plaintiff seeks to avoid any alleged transfers to AimBank from the RD Purchasers, Plaintiff lacks standing because neither Plaintiff nor the Creditors have suffered an injury in fact, and the Court should grant AimBank's Motion for Partial Summary Judgment as to Count 1 and Count 2 of Plaintiff's Complaint.

### III. CONCLUSION

36. For these reasons, defendant asks the Court to grant this Motion and render a partial summary judgment in AimBank's favor.

Dated: July 15, 2022          Respectfully submitted,

HUSCH BLACKWELL LLP

By: */s/ Richard A. Illmer*
Lynn Hamilton Butler
State Bar No. 03527350
111 Congress Avenue, Suite 1400
Austin, Texas 78701
Tel: (512) 472-5456
Fax: (512) 479-1101
lynn.butler@huschblackwell.com
Richard A. Illmer
Husch Blackwell LLP
1900 N. Pearl Street, Suite 1800
Dallas, Texas 75201
(214) 999-6100
(214) 999-6170 (fax)
rick.illmer@huschblackwell.com

**COUNSEL FOR AIMBANK AND HEARTLAND FINANCIAL USA, INC.**

**CERTIFICATE OF SERVICE**

 I certify that on July 15, 2022, a copy of this document was served by electronic service on all counsel of record via the Court's CM/ECF system.

*/s/ Richard A. Illmer*
Richard A. Illmer
